UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

DIANA COLLINS,

      Plaintiff,

v.

COREWELL HEALTH SYSTEM, and
COREWELL HEALTH HOSPICE & PALLIATIVE CARE,

      Defendants.

Case No. 1:26-CV-324

Hon.

_____

## COMPLAINT AND JURY DEMAND
_____

## COMPLAINT

1.     This action arises under the False Claims Act ("FCA"), 31 U.S.C. § 3729 et seq.; and a factually-related state law claim for violation of Michigan's Whistleblowers' Protection Act ("WPA"), Mich. Comp. Laws § 15.361 et seq.

2.     This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1367.

3.     Venue is proper in the Western District of Michigan. The acts which are the subject of this action occurred in the Western District of Michigan.

### THE PARTIES

4.     Plaintiff Diana Collins was employed as a Payment Integrity Analyst at Defendant Corewell Health Hospice & Palliative Care ("Corewell Hospice") in St. Joseph, Michigan, in Berrien County, within the Western District of Michigan. At

all times relevant to this Complaint, Plaintiff was a resident of Kent County, Michigan, located in the Western District of Michigan. Plaintiff worked for Corewell and various predecessor entities in a variety of capacities for almost 20 years. On June 6, 2025, Corewell terminated Plaintiff without cause as part of an alleged layoff.

5.    Defendant Corewell Health System delivers healthcare of various types to patients throughout Michigan via a number of different legal entities, including but not limited to multiple hospital and outpatient surgery centers, a Medical Group employing hundreds of physicians in multiple practice specialties, and entities providing other ancillary healthcare services and therapies.

6.    Defendant Corewell Hospice is an entity owned by Corewell Health System which provides hospice and palliative care services to patients being cared for in a variety of settings, including at Corewell Health System's multiple hospital locations.

## FACTUAL ALLEGATIONS

7.    For the last decade, the bulk of Plaintiff's job consisted of determining and inputting diagnosis coding in the St. Joseph hospital location for hospice care. Additionally, a large percentage of her duties included reviewing medical records, creating all documentation training materials, and conducting all documentation training sessions. She was a crucial member of the team there, which is a relatively small location in West Michigan. Doctors, advanced practice providers like nurse practitioners, and other staff who worked at the St. Joseph location recognized

Plaintiff as having a deep knowledge of diagnosis coding regulations—specifically the coding regulations unique to hospice care as stated in the Medicare regulations.

8.      It is critical to bill appropriately and correctly, and assigning the correct codes to items billed to insurers is a crucial part of that process. The federal government seeks civil and/or criminal penalties against entities and individuals who it determines have overbilled or wrongly billed the federal government's Medicare and/or Medicaid programs for items incorrectly or fraudulently. Individuals who work in healthcare are trained in this reality and are well-aware of the significance of accurate coding, even those whose job duties do not directly involve performing coding work themselves.

9.      Moreover, hospice billing is different from hospital or medical office billing. Instead of billing for each service provided, hospice care is paid a per diem rate. Plaintiff's critical contribution was to make certain claims were billed with the appropriate diagnosis codes and that medical record documentation supported those diagnoses.

10.     In September 2024, after Defendant Corewell Health System acquired the St. Joseph hospital from another hospital system, which included the St. Joseph hospice function, Defendants' leadership asked Plaintiff to summarize the history of her job positions/job functions. She provided a comprehensive history, including her job functions of preadmission chart reviews, coding, and chart reviews for long stay patients or patients whose eligibility for services was questionable or otherwise at issue. Plaintiff needed to sign a new apartment lease and asked about the security

of her position. Brandy Chorba (Plaintiff's immediate supervisor) and Lisa Serna (the Clinical Director) told her that her position was secure—that "Don't worry. You aren't going anywhere." Neither Chorba nor Serna expressed any surprise that Plaintiff covered all of these functions at this location, or acted like it was unusual that this type of work to ensure billing compliance would occur.

11.    In light of Chorba's and Serna's answer to her direct question, Plaintiff signed her next 12-month apartment lease. At that time, Plaintiff was part of the leadership team at the St. Joseph location and was in the Manager On Call After Hours/Weekend Rotation.

12.    On January 23, 2025, Plaintiff sent a long email to Lisa Serna politely detailing compliance concerns she had observed since Corewell began to institute certain changes, resulting in services being overbilled and billed incorrectly. These were not minor infractions, but Serna dismissed Plaintiff's concerns.

13.    Chorba and Serna then began to inform Plaintiff over time that various job functions would be taken away from her as part of alleged "reorganization" of roles of those who worked at the St. Joseph location.

14.    Nonetheless, Plaintiff continued to press leadership on some of the compliance concerns, which she believed in good faith were serious potential violations of the law, only to experience further reduction in job responsibilities. Plaintiff told Serna and Chorba that she was being asked to unlawfully code procedures and services, and that Defendants needed to allow her to enter codes correctly and lawfully. Plaintiff advised Chorba, as her immediate supervisor, that

she would report the violations of law to the government if the coding was not done correctly.

15.     When Defendants continued requiring coding that Plaintiff believed to be illegal, Plaintiff completed an online report to the federal government's Office of Inspector General (OIG) in March 2025. OIG is an investigatory law enforcement agency who polices matters like fraudulent medical billing to federal healthcare programs.

16.     Around April 9, 2025, Serna, Chorba, and a compliance employee, Sandy Nelson, told Plaintiff to enter whatever diagnosis codes the Medical Director wanted, even though it was in violation of coding regulations that Plaintiff previously emailed to report. Eventually, Defendants removed or significantly changed and thwarted almost all of Plaintiff's duties, to the point of barring her from accessing charts. Defendants expected Plaintiff to enter diagnosis codes as she was instructed without being allowed to access patient charts. When she objected to this based on federal guidelines which forbid entering codes without having access to charts to check the accuracy, she was again told by Defendants' agents to do it anyway.

17.     Plaintiff also made a complaint to the internal compliance department hotline for Corewell. Personnel on that hotline told her that she was correct in her concerns, and that they were sorry she had been treated so badly. Personnel on the hotline also informed Plaintiff that they had had "issues" with the Medical Director in the past.

18.     Plaintiff submitted her online OIG fraud report and her report to Corewell's own compliance department because her attempts to work with Corewell leadership assigned to her facility in St. Joseph to correct the compliance issues were repeatedly dismissed – even when Plaintiff told Defendants she would have no other choice but to report what she felt were violations of law to enforcement authorities if Defendants continued as they were.

19.     The day after Plaintiff made her report to Corewell's compliance department, Defendants notified Plaintiff that it would be eliminating her job position in an alleged layoff. Corewell then terminated Plaintiff's employment without cause as of June 6, 2025.

20.     Upon information and belief, Defendants' selection of Plaintiff for the layoff was motivated by her continued insistence on addressing the compliance concerns that local management did not want to hear, including but not limited to noting that she would report Defendants to law enforcement if they did not comply with the law in their medical coding, and/or her eventual report to OIG.

### Count I – Violation of False Claims Act - Retaliation

21.     Plaintiff incorporates the allegations of prior paragraphs, as if they were restated herein.

22.     Plaintiff engaged in protected activity, as defined by 31 U.S.C. § 3730(h)(1), by undertaking steps to stop Defendants from submitting claims for reimbursement to Medicare and/or Medicaid, which were based upon fraudulent records and/or codes.

23.     Plaintiff's steps to stop Defendants from billing under fraudulent records and/or codes included a report to OIG.

24.     Because of Plaintiff's attempts to stop Defendants from billing under fraudulent records and/or codes, including her statements that she was about to report these violations of law if they did not stop, Defendants took a variety of adverse actions in retaliation against Plaintiff, including selecting her from layoff from her position with compliance duties, and eventually terminating her employment.

**WHEREFORE**, Plaintiff requests that the Court award Plaintiff economic and compensatory non-economic damages in an amount that would fully compensate her for the injuries alleged herein, her costs and reasonable attorney fees, and such other relief as may be just and equitable.

### Count II – Violation of Michigan's Whistleblowers' Protection Act

25.     Plaintiff incorporates the allegations of prior paragraphs, as if they were restated herein.

26.     Plaintiff engaged in protected activity, as defined by Mich. Comp. Laws § 15.361 et seq., by reporting to OIG that Defendants were submitting claims for reimbursement which were based upon fraudulently coded medical records, which violates federal and state law.

27.     Defendants took a variety of adverse actions, including eventual termination of employment, in retaliation for Plaintiff's protected activity under WPA.

28.     Defendants also retaliated against Plaintiff by firing her, among other actions, because she was about to report Defendants' illegal activity, which Plaintiff advised Defendants she would report if they did not code procedures correctly.

29.     As a result of the foregoing, Plaintiff has lost earnings and benefits and incurred mental anguish, emotional distress, unfair reputational damage, and legal costs and attorney fees for which Defendants are liable.

**WHEREFORE**, Plaintiff requests that the Court order that she be returned to her position or an equivalent one and/or award Plaintiff economic and compensatory non-economic damages in an amount that would fully compensate her for the injuries alleged herein, costs and reasonable attorney fees, and such other relief as may be just and equitable.

PINSKY SMITH, PC
Attorneys for Plaintiff

Dated: January 28, 2026

By: /s/ Sarah R. Howard
Sarah Riley Howard
146 Monroe Center St NW, Suite 418
Grand Rapids, MI  49503
(616) 451-8496
showard@pinskysmith.com

## JURY DEMAND

To the extent that jury trial is available as to any of the issues set forth above, Plaintiff hereby demands same.

PINSKY SMITH, PC
Attorneys for Plaintiff

Dated: January 28, 2026

By:    /s/ Sarah R. Howard
Sarah Riley Howard
146 Monroe Center St NW, Suite 418
Grand Rapids, MI  49503
(616) 451-8496
showard@pinskysmith.com